## U8 CIV 6582

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| N. A. LAMBRECHT,<br>**Derivatively on Behalf of Merrill Lynch**<br>**& Co., Inc., and its Shareholders,**<br><br>Plaintiff,<br><br>v.<br><br>**E. STANLEY O'NEAL, AHMASS L.**<br>**FAKAHANY, GREGORY J. FLEMING,**<br>**JEFFREY N. EDWARDS, CAROL T.**<br>**CHRIST, VIRGIS W. COLBERT,**<br>**ALBERTO CRIBIORE, JOHN D. FINNEGAN,**<br>**JUDITH MAYHEW JONAS, JOSEPH W.**<br>**PRUEHER, ANN N. REESE, AULANA L.**<br>**PETERS and CHARLES O. ROSSOTTI,**<br><br>Defendants,<br><br>and<br><br>**MERRILL LYNCH & CO., INC.,**<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |



Case No.

JUL 2 4 2008

U.S.D.C. S.D. N.Y.
CASHIERS

### COMPLAINT

#### NATURE OF THE CASE

1.    Plaintiff N. A. Lambrecht, a shareholder of Merrill Lynch & Co., Inc., ("Merrill

Lynch" or "the Company") at all relevant times, brings this derivative action on behalf of the

Company and its shareholders against certain current and former officers and directors of Merrill

Lynch to remedy, *inter alia*, the massive mismanagement of the Company, breaches of fiduciary

duty, waste of the Company's assets, deliberate concealment of such wrongful conduct and to

recover for the Company the damages caused thereby. The reckless investment and participation in subprime financing and related investment vehicles by management under the purported oversight of the members of the Company's Board of Directors has cost Merrill Lynch billions of dollars and will continue to have a devastating impact on its financial and operating condition long into the future. Indeed, as the Company's most recent Chief Executive Officer, John A. Thain, said of the defendants on January 17, 2008: "They shouldn't be taking risks that wipe out the earnings of the entire firm."

2.      As a result of the defendants' wrongdoing alleged herein, Merrill Lynch has been damaged by more than $20 billion. As Kathy Bostianic, the Company's Senior Economist recently acknowledged: "We've only seen maybe the first wave or two impact, and there's more to come." Mr. Thain, as well, said: "We have not seen the bottom." This has caused the Company to sell assets and raise equity at "fire sale" prices, thereby injuring further Merrill Lynch's shareholders.

## Factual and Legal Allegations

3.      The concealed and systemic failure of risk management and lax credit standards under the leadership of Merrill Lynch's former chief executive, Defendant Stanley O'Neal, propelled the Company to become the leading underwriter of billions of dollars of collateralized debt offerings ("CDOs") secured by risky subprime mortgages. Throughout his tenure, the extraordinary risks to which the Company was exposed by this heavy commitment to subprime investments were concealed from the Company's shareholders and the investing public generally.

4.      By the third quarter of 2007, economic developments caused these previously concealed risks and financial speculations by management to begin to be exposed. The Company announced a write-down of more than $8 billion in the value of its CDOs and other

investments in high-risk subprime mortgages and related derivative instruments, the beginning of the revelation of the debacle that had been visited upon Merrill Lynch by the defendants.  By the end of 2007, the Company reported losses of $7.78 billion for the year, compared with $7.5 billion reported as profits for 2006, a swing of $15.28 billion in just one year.  Merrill Lynch's share price has fallen from $97.53 on January 24, 2007 to $28 last week, an approximately 70% decrease in value.

5.       In the years leading up to the revelations which began in late 2007, and particularly in the period 2006-2007, Merrill Lynch's Board and senior management knew, or should have known, of a number of "red flags" about the severe and increasing risks of loss on an enormous scale from CEO O'Neal's reckless policies in the sphere of subprime mortgages – their origination, securitizing and underwriting as CDOs – together with related practices, such as concealing these risks in the Company's off-the-books entities and the exposure of the Company as a result of its improper marketing of financial derivatives of questionable value.  A variety of policies and circumstances created the unacceptable level of risk marked by those "red flags" including:

f.       Merrill Lynch's rapid expansion into holding and marketing high-risk financial derivative products without putting in place the business skill set to manage and understand the corresponding risks and their evolving nature;

g.       Merrill Lynch's dramatic increase in unprotected exposure as a result of holding and marketing subprime-backed securities despite recognizable signs of distress in the housing market, including rapidly rising delinquency rates on subprime loans and various other warnings readily available to the defendants;

3

h.      Merrill Lynch's aggressive growth of its CDO business, even as credit markets deteriorated and subprime mortgage defaults increased, contrary to the fact that the head of Merrill's CDO group had budgeted zero growth in 2006;

i.      The loss of the core of the Company's CDO group, including its leader Christopher Ricciardi, in February 2006, and the purging of the senior vice president for structured products, Jeffrey Kronthal, in July 2006, which left Merrill Lynch with a void of senior managers capable of overseeing the increasingly significant risks created by CDO underwriting;

j.      The deteriorating market for CDO and subprime mortgage-backed investments, which forced Merrill Lynch to accumulate a significant concentration in subprime residential and asset-backed securities as it continued its underwriting activities through 2006 and 2007, including "unloading" such securities on unsuspecting investors;

k.      The continued artificial inflation of asset values due to management's calculating their worth based on unjustified assumptions which disregarded the actual housing markets, credit markets and liquidity conditions affecting the value of subprime and asset-backed securities;

l.      The sheer magnitude of the Company's subprime exposure, which made it difficult, if not impossible, to shield Merrill Lynch from substantial losses when the subprime industry collapsed;

m.      The failure of Merrill Lynch to have in place a Chief Risk Officer position until September 10, 2007, long after the Company's operational and financial risks had grown to unmanageable levels; and

4

n.      Management's false and misleading statements regarding the dire circumstances the Company faced as a result of its CDO and sub-prime investment practices, artificial inflation of its earnings, assets and net worth including concealment of the risks inherent in Merrill Lynch's off-the-books entities, known as "Variable Interest Entities" (VIEs) and contingent liabilities, all of which caused the market prices of Merrill Lynch stock to be artificially inflated.

### REQUIRED DEMAND PURSUANT TO RULE 23.1

6.      By letter dated January 22, 2008, in compliance with Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiff, through her counsel, made demands on Merrill Lynch's Board to, *inter alia*, pursue through litigation, the claims alleged in this action and name as defendants those identified above, among others responsible for the wrongdoing as alleged herein (the "Demand Letter").  A copy of the Demand Letter is attached hereto as Exhibit "A." In response, Merrill's Board abdicated its responsibilities to the Company and its shareholders. No effort was made by the Board to cause the Company to act upon the demands set forth in the Demand Letter.  Instead, by letter dated May 1, 2008, Judith A. Witterschein, Managing Director and Corporate Secretary of Merrill Lynch, responded on behalf of the Board, summarily rejecting Plaintiff's demands and refusing to take any of the actions demanded.  A copy of such letter is attached as Exhibit "B."

### JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein under 28 U.S.C. §1332, as complete diversity exists between plaintiff and each defendant and the amount in controversy well exceeds the jurisdictional minimum of this Court.

8.     This action was not brought collusively to confer jurisdiction on a court of the United States that would not otherwise have jurisdiction.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of herein occurred in this District and most, if not all, of the defendants reside in and/or have transacted business within this District.

10.    Plaintiff brings this action derivatively on behalf of nominal defendant Merrill Lynch and its shareholders.   No claims are asserted against Merrill Lynch.   Plaintiff will adequately and fairly represent the interests of Merrill Lynch and its shareholders in enforcing and prosecuting their rights.

## THE PARTIES

### A.  PLAINTIFF

11.    Plaintiff N. A. Lambrecht is a citizen of Florida who owns and has owned common stock of Merrill Lynch at all relevant times.

### B.  NOMINAL DEFENDANT

12.    Nominal defendant Merrill Lynch, a Delaware corporation, is one of the world's largest securities brokerage, wealth management, capital markets, and advisory companies.   As an investment bank, Merrill Lynch is a leading global trader in and underwriter of securities and derivatives across a broad range of asset classes, and serves as a strategic advisor to corporations, governments, institutions, and individuals worldwide.   Its principal place of business is 4 World Financial Center, 250 Vesey Street, New York, New York. Plaintiff makes no damage claims against the Company.

## C. INDIVIDUAL DEFENDANTS

13.     Defendant E. Stanley O'Neal ("O'Neal") was at all relevant times a director, Chairman of the Board, and Chief Executive Officer of Merrill Lynch.  O'Neal received a cash bonus of $18.5 million plus a stock grant of $26.8 million for 2006 based on the Company's purported performance.  On October 30, 2007, Merrill Lynch announced that Defendant O'Neal had resigned his position with the Company.  Notwithstanding such voluntary resignation, Defendant O'Neal was compensated as if he had been terminated involuntarily and is reported to have received termination benefits of as much as $150 million, notwithstanding the debacle that he had caused to befall the Company.  Upon information and belief, O'Neal is a citizen of New York.

14.     Defendant Ahmass L. Fakahany ("Fakahany") was at all relevant times co-President and Chief Operating Officer of Merrill Lynch.  Defendant Fakahany received a cash bonus of $11.65 million plus a stock grant of $16 million for 2006 based on the Company's purported performance.  He resigned his positions with the Company on February 1, 2008 and, as with Defendant O'Neal, received and will receive substantial termination and related benefits. Upon information and belief, Fakahany is a citizen of New York.

15.     Defendant Gregory J. Fleming ("Fleming") is, and at all relevant times was, a President and Chief Operating Officer of Merrill Lynch.  He served as co-President until Defendant Fakahany's departure, and now is the sole President of the Company.  Defendant Fleming received a cash bonus of $13.25 million plus a stock grant of $18.4 million for 2006 based on the Company's purported performance.  Upon information and belief, Fleming is a citizen of New York.

16.    Defendant Jeffrey N. Edwards ("Edwards") was at all relevant times Senior Vice President and Chief Financial Officer of Merrill Lynch, who was responsible for the Company's market and credit risk management, treasury, financial reporting and controls, corporate and strategic planning, internal audit and tax policy, as well as regulatory reporting and supervision. Edwards received a cash bonus of $5.625 million plus a stock grant of $8.183 million for 2006 based on the Company's purported performance.  In December, 2007, Defendant Edwards became Vice Chairman and a member of the Executive Client Coverage Group.  Upon information and belief, Edwards is a citizen of New York.

17.    Defendant Carol T. Christ has been a member of Merrill Lynch's Board of Directors since 2007.  Upon information and belief, Christ is a citizen of Massachusetts.

18.    Defendant Virgis W. Colbert has been a member of Merrill Lynch's Board of Directors since 2006.  Upon information and belief, Colbert is a citizen of Wisconsin.

19.    Defendant Alberto Cribiore has been a member of Merrill Lynch's Board of Directors since 2003.  Upon information and belief, Cribiore is a citizen of New York.

20.    Defendant John D. Finnegan has been a member of Merrill Lynch's Board of Directors since 2004.  Upon information and belief, Finnegan is a citizen of New Jersey.

21.    Defendant Judith Mayhew Jonas has been a member of Merrill Lynch's Board of Directors since 2006.  Upon information and belief, Jonas is a citizen of the United Kingdom.

22.    Defendant Joseph W. Prueher has been a member of Merrill Lynch's Board of Directors since 2001.  Upon information and belief, Prueher is a citizen of Virginia.

23.    Defendant Ann N. Reese has been a member of Merrill Lynch's Board of Directors since 2004.  Upon information and belief, Reese is a citizen of New York.

24.   Defendant Aulana L. Peters has been a member of Merrill Lynch's Board of Directors since 1994.  Upon information and belief, Peters is a citizen of New York.

25.   Defendant Charles O. Rossotti has been a member of Merrill Lynch's Board of Directors since 2004.  Upon information and belief, Rossotti is a citizen of the District of Columbia.

### GENERAL ALLEGATIONS

### A.  MERRILL LYNCH PLUNGES INTO HIGH RISK SECURITIES

26.   Between 2003 and 2006, under Defendant O'Neal's direction, Merrill Lynch management undertook a dramatic transformation of the Company's Fixed-Income, Currencies and Commodities ("FICC") business, shifting from its traditional focus on interest rate and credit products to riskier financial instruments, including little understood derivatives and subprime mortgage origination.

27.   This transformation, engineered by Defendant O'Neal and his subordinates, centered on Merrill Lynch's rapidly increasing involvement with underwriting CDOs, resulting in the Company's ascent from "from bit player to powerhouse in the lucrative business of bundling loans into salable securities."  Serena Ng and Carrick Mollenkamp, *Merrill Takes* $8.4 *Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities*. WALL STREET JOURNAL (Oct. 25, 2007).  The CDO business was spearheaded by a young banker, Christopher Ricciardi, who joined Merrill Lynch in 2003.  As Managing Director and Head of Global Structured Credit Products for the Company, he was responsible for the origination and structuring of all CDOs, structured funds and structured credit derivatives.  Mr. Ricciardi led Merrill Lynch to its position as the top Global underwriter of CDOs in 2003, 2004, and 2005.  *Id.*

28.    Bundling loans into salable securities involves significantly more risk and uncertainty than traditional interest rate and credit products.  CDOs hold inventories of asset-backed or income securities at various risk levels.  Underwriters then market rights to the income from these various levels in tranches set by debt type and risk levels.  These securities are inherently complex, not well-understood in the industry or by prospective customers, and their values depend on several variables, including market, credit, liquidity, and other market conditions affecting the various constituent securities.

29.    These securities became increasingly popular in the early 2000's, when low interest rates made regular bond yields less attractive and spurred significant growth in consumer and mortgage borrowing.

30.    Despite the dangers inherent in these new financial products, the Board, Defendant O'Neal and senior management rushed Merrill Lynch forward into the CDO market without establishing sufficient risk-management processes to safeguard its business and to limit its exposure to market volatility.  Defendant O'Neal and senior management relied primarily on Mr. Ricciardi to develop this CDO business.

31.    A central component of Merrill Lynch's CDO underwriting was the bundling of subprime mortgage securities into CDO products.  "Subprime" mortgage loans refer to loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio, or an extended period for repayment, or describe loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan terms.  To create liquidity for these subprime mortgages, lenders, including Merrill Lynch, combined them with other asset-backed securities into CDOs.

## B. Merrill Lynch's Persistent Failure to Manage Risk as the Market Deteriorated.

32.     Housing market troubles emerged in 2005, but Merrill Lynch management continued aggressive underwriting of CDOs, as the Company's total "soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages." *Id.*

33.     Subprime mortgage exposure grew even riskier in 2006, when the subprime lenders further lowered their standards, originating no-documentation and low-documentation loans, known in the industry as "liar loans."  This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.  Gretchen Morgenson, *Crisis Looms In Mortgages,* New York Times (March 11, 2007).  Mortgage industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases. *Id.*

34.     The slowdown in the market for subprime-backed securities was well known and was known or should have been known by each of the defendants.  Mr. Ricciardi, then still head of the CDO group, budgeted for no growth in 2006.  *Merrill Takes $8.4 Billion Credit Hit, supra.* Mr. Ricciardi departed from Merrill Lynch in February 2006 and, despite his zero CDO budget for 2006, Dow Kim, Executive Vice-President and Co-President of the Company's Global Markets and Investment Banking Group, with the encouragement of Defendant O'Neal, pushed Merrill Lynch deeper into the CDO market.  Defendant Kronthal, who argued for a cautious approach, was forced out as Executive Vice President for Structured Products in July 2006.

35.     Later that year, Kenneth Bruce, Merrill Lynch's own analyst, warned his clients that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.  Mr. Bruce specifically warned that an "asset fire-sale" could cause prices to fall.  Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Markets,* Reuters, Sept. 26, 2006.

36.     Despite the market conditions known to the defendants, Merrill Lynch management moved recklessly to extend the Company's lead in underwriting mortgage-backed CDOs throughout 2006 and dramatically expanded its commitment to subprime mortgages in December 2006, paying $1.3 billion to buy First Franklin Corp., together with Home Loan Services and NationsPoint, mortgage companies which catered to subprime borrowers.   These reckless acquisitions not only reflected Defendant O'Neal's continuing speculation but, as well, an utter failure of due diligence on the part of the Company's management as well as its financial and legal advisers with respect to the transactions.   As REUTERS reported: "The First Franklin deal puzzled analysts because the market for subprime loans was souring in a hurry when the deal was announced.   Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt."  Al Yoon, *Merrill's Own Subprime Warnings Unheeded,* REUTERS (Oct. 29,2007).   Countrywide's CEO Angelo Mozilo, who was well-acquainted with the sub-prime mortgage business, called First Franklin "a flawed company" that was worth, at most, just one-sixth of what Merrill Lynch paid for it, or $200 million.  Barely more than a year later, Merrill Lynch had to simply close First Franklin down as less than worthless, taking $200 million in charges.

37.     Of much greater harm to Merrill Lynch than the ill-timed overpayment for First Franklin was the disastrous policy that animated Defendant O'Neal's purchase of Franklin -- taking Merrill Lynch even further into the subprime market.  Franklin ranked among the nation's five biggest subprime lenders, funding $24 billion annually.  Home Loan Services serviced $44.2 billion in subprime mortgages, so its acquisition made Merrill the second largest Wall Street servicer of subprime loans.  These recklessly acquired subprime lenders and servicers brought to Merrill a massive stream of the radically unsound subprime mortgages of 2006-2007, just as the

bubble burst, and these mortgages, and the securities they backed, became illiquid and depreciated. The high-risk nature and fundamental unsoundness of such mortgages would have been obvious to anyone who had conducted an appropriate "due diligence" investigation of the acquired companies, which investigation was not carried out by Merrill Lynch management or by its legal or financial advisors.

38. Another strategy pursued by the Board and senior management was the securitization of so-called "piggyback loans", second-liens used by borrowers to provide the deposits on home purchases funded by other first-lien loans; for example, a borrower would take out a first-lien 80 percent loan, and fund the other 20 percent, not by a cash deposit, but by the second-lien "piggyback loan." Driven by Defendant O'Neal's reckless risky securitizing policies and practices, Merrill Lynch became a specialist in securitizing these "piggyback loans," many of which were based on exaggerated appraisals created to facilitate the loans. As The NEW YORK TIMES commented, "that mortgage securitization is a candidate for the title of worst ever." Homeowners walk away from "piggyback loans" when property values fall. Foreclosure is seldom worth the effort for such loans, since all the proceeds go to the first mortgage holder and many of the mortgages represented 100% loan-to-value ratios even before prices dropped. By May 2008, Moody's expected these mortgages to lose more than 60 percent of their original pool balance, and the securitization of those mortgages would lose much more because of the complete lack of appeal to investors of such securities in a market clogged with other distressed subprime mortgage-backed securities and CDOs.

39. By 2006, Merrill Lynch was dealing in mortgage-backed securities in such volume that it could no longer rapidly unload them to customers or otherwise. Until these securities were sold, the Company ran the very great risk that they would lose significant value if

borrowers defaulted on the underlying loans.  To protect itself from this danger, Merrill Lynch paid premiums to insurance companies that guaranteed mortgage bonds, all the while concealing from the insurers the true "quality" of the underlying assets.  However, in late 2005, American Insurance Group, one of the largest providers of such coverage, stopped insuring subprime-backed securities -- another warning of what was to come.  Though Merrill Lynch continued to obtain some insurance coverage for its expanding CDO position, it apparently did so inadequately, leaving itself substantially exposed to loss.  In January 2008, the Company announced that it expected $3.1 billion in losses related to inadequate bond insurance coverage.

40.   Defend O'Neal's reckless policies, acquiesced in by the Board, aside from the other risks faced by the Company, put Merrill Lynch in an dangerously vulnerable posture since its illiquid investments reflected a high multiple of its limited equity.  "By mid-2007 estimates, Merrill had $150 billion in illiquid investments, or four times its equity," reported FORBES in April 2008.

41.   Compounding this utterly untempered rush into CDOs and other subprime-related investments, and perhaps among the most serious of the reckless steps taken by the Company during Defendant O'Neal's tenure as CEO, was Merrill Lynch's taking into its own portfolio the unsalable tranches of CDOs, amounting to $30 billion in the first half of 2007.  Merrill had set these up as securities reflecting various pools of CDOs, frequently conspiring with rating agencies to accord unjustifiably high ratings to these securities.

42.   Despite these ratings, large quantities of the CDO-backed securities remained unsold.  Nevertheless, Defendant O'Neal encouraged his subordinates and the traders under them to keep plunging ahead on assembling further CDO issues, to keep up the Company's short-term

fee income derived from setting up the CDOs and, above all, to continue Defendant O'Neal's reckless policy of doing "whatever it takes" to build and retain market share in CDOs.

43.     Under Defendant O'Neal's direction, the Company's senior management permitted traders to add the unsold CDOs to Merrill Lynch's own in-house inventory, artificially valuing them at the prices that they had hoped to, but did not get, in the market.  This practice lasted from January to June, 2007, at which time Merrill Lynch held CDOs which it valued at more than $32 billion.   As *Fortune* commented, "That turned out to be one of the worst miscalculations in the annals of risk management."  By the end of June 2007, Merrill Lynch held $41 billion in subprime CDO and subprime mortgage bonds.

44.     Former Merrill Lynch executives say the Company ordered, at the end of 2006, the conversion of subprime mortgage pools to CDOs about which Osman Semerci and others in fixed-income management provided Defendant O'Neal with regular updates. As a member of Merrill Lynch's management told *The New Yorker*, "The notion that, in the summer of 2007, Stan [O'Neal] suddenly woke up and discovered the C.D.O. exposure is ludicrous."  Similarly, all members of Merrill Lynch's Board either knew or should have known of these practices as Defendant O'Neal provided them with regular updates as to such exposure.  Despite such knowledge, during the first and second quarter of 2007, Merrill Lynch did not take write-downs nor accumulate reserves to reflect the Company's artificially valued $32 billion accumulation of toxic CDOs, or the reasonably likely losses that the Company would sustain as a result of holding them.  Consistent with Defendant O'Neal's policies and concealment of the Company's true financial condition from the public, Mr. Semerci and another fixed-income executive, Dale Lattanzio, took the position that Merrill Lynch's CDO positions were worth their face value.

45.    As they drove Merrill Lynch ever deeper into the unsteady subprime market, the Board, Defendant O'Neal and the Company's senior management continued to fail to establish or maintain adequate risk-assessment processes or risk-management strategies.   Neither the Board nor management had any serious mechanism or plan in place to deal with Merrill Lynch's $40 billion CDO and subprime-mortgage exposure if and when the credit market retrenched. For example, while many companies comparable to Merrill Lynch had long had a chief risk officer, it was only far too late, in September 2007, that the Company hired such an executive.  Without a chief risk officer, as its members knew or should have known, the Board's Finance Committee did not have in place the key person to help fulfill its responsibility of informing itself about the Company's greatest area of reckless exposure, subprime mortgages and the derivative securities issued and sold by Merrill Lynch. Moreover, notwithstanding the materiality of these mortgages and securities in Merrill Lynch's business, neither the Board's Finance Committee, nor the Board as a whole, included a single member with experience relevant to subprime mortgages and the risks inherent therein.   As Meredith Whitney, the highly regarded financial analyst at CIBC World Markets, commented about Merrill Lynch's Board, "You would think you would want some experts on subprime because that was the risks they were taking on."   As a result, the Board placed an enormous, ill-advised, unhedged gamble on Defendant O'Neal's unrestrained adventure into subprime financing.   Without a chief risk officer, the Board and senior management willfully blinded themselves to the impending disaster their policies invited.

46.    The Company employed various "models" in the valuation of CDOs and other related assets.  The key model Merrill Lynch used was called the "value at risk" or VAR, which uses historical trading patterns to determine the probability of loss, a model Defendant O'Neal and senior management knew or should have known would not have been useful for valuing the

Company's holdings of CDOs and other comparable assets given its lack of a meaningful "track record" with respect to these assets.  Merrill Lynch's 10-Q for the third-quarter of 2007 belatedly acknowledged the unreliability of its models for determining risk of loss: "VAR, stress tests, and other risk measures significantly underestimated the magnitude of actual loss from the unprecedented credit market environment," for, "[i]n the past, these AAA ABS CDO securities had never experienced a significant loss in value."  The belatedness of this recognition of the high unreliability of these models derives from a number of factors which was known or should have been known by defendants.  First, VAR relies on historical norms, while the types of CDOs held by the Company, having burgeoned since the previous period of declining real estate values, did not have "down" years to make VAR realistic.  Second, the models treated 2007 "subprime mortgages" as the same as 1997 "subprime mortgages," when the types of subprime mortgages made in 2007 had far greater credit risks and far greater risks in the underlying housing prices than the 1997 instruments.  Merrill Lynch's management had full knowledge of the risks of loss it faced.  Such knowledge was derived in part from the subprime mortgage originator, Ownit, of which Merrill Lynch owned a 20% share, going bankrupt in late 2006, and from the information within First Franklin about the very mortgages it originated.  Third, VAR assumed securities prices had a normal, bell-curve distribution – consigning those events with large risk to the category of "rare" events – when Merrill Lynch's senior management knew or should have known that the model breaks down in reality precisely because the "rare" events were not, in fact, rare at all.

47.   This failure to manage the Company's risk exposure also stems in part from Defendant O'Neal's broader personnel decisions that created a management team that shared his

unfettered appetite for risk, which the Board condoned until its brutal consequences were publicly revealed starting in October 2007.

48.    In the several years before 2006, Merrill Lynch had first expanded its mortgage department under Christopher Ricciardi, who came to the Company from Credit Suisse.   Also during that earlier period, Jeffrey Kronthal, an experienced and cautious senior executive, had tried to provide a counterweight to excessively risky activity.   Just when the bursting of the subprime bubble began to loom, and such qualities in the Company's executives as experience and caution mattered most, Mr. Ricciardi left Merrill Lynch (February 2006) and Defendant O'Neal ousted Mr. Kronthal, announcing his departure with two of his colleagues including Harry Lengsfield in July 2006.

49.    Defendant O'Neal replaced these departed senior executives with inexperienced personnel, who were provided with financial incentives to make high-risk speculations with the Company's funds in fulfillment of Defendant O'Neal's reckless policies.   As a former member of Merrill Lynch's Executive Committee told THE NEW YORKER, "Kronthal consistently expressed opposition to the buildup of these assets on the balance sheet – C.D.O.s, in particular . . . He thought it was too risky."   Another Merrill Lynch source told The NEW YORK TIMES that "Mr. Kronthal and Mr. Lengsfield were let go because they were told by senior executives at Merrill that they were not taking enough risk."   By contrast, the replacements of Messrs. Kronthal, Ricciardi, and their teams included Dow Kim as co-head of global markets, Osman Semerci as head of fixed-income securities, and Dale Lattanzio as head of structured-credit securities, who were prepared to advance the Defendant O'Neal's reckless rush into the subprime world.   At the time Mr. Ricciardi left in early 2006, Mr. Kim, the co-head of global markets, told the remaining staff under him in the CDO division that the Company would do "whatever it

takes" to maintain its outsized market share in underwriting.  With these personnel maneuvers, Defendant O'Neal was able to launch the disastrous policies of recklessly increasing risk that Mr. Kronthal had tried to oppose.  Messrs. Semerci and Lattanzio were fired in disgrace, belatedly, in October 2007, as Merrill Lynch's enormous failures began to be publicly acknowledged.  By then, Mr. Kim had left the Company, and the connections with the Company that he had retained for some months in 2007 were severed.

50.     Thus, the systemic risk-management failure at Merrill Lynch was exacerbated by personnel turnover within the Company's CDO group in early 2006 and persisted even after deteriorating credit and housing market conditions were broadly recognized in late 2006. "During his five-year tenure, Mr. O'Neal has been criticized for making such extensive cuts in Merrill's costs and former brain trust that the firm lost its institutional memory of how to manage its risks. . . . [H]e approved the replacement of a group of senior capital-markets executives led by Jeffrey Kronthal with a younger, most risk-prone team."  Randall Smith, *Merrill Loss May Be Wider Than Projected*, WALL STREET JOURNAL (Oct. 24, 2007).  This new group of CDO managers pushed Merrill Lynch even deeper into the subprime quagmire and billions of dollars of losses.

### C. MERRILL LYNCH'S DISSEMINATION OF INCOMPLETE AND INACCURATE INFORMATION CONCERNING ITS FINANCIAL CONDITION AND RISK EXPOSURE

51.     The Company's Board and senior management repeatedly made false statements regarding the true financial and operating condition of Merrill Lynch and gave false assurances regarding the sufficiency of its risk management processes.  These false and deceptive statements caused the price of Merrill Lynch stock to be artificially inflated.

52.     On January 18, 2007, Merrill Lynch reported its financial results for the fourth quarter and full year 2006, in a release in which Defendant O'Neal touted:

> By virtually any measure, our company completed the most successful year in its history.  Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent.

53.   On that date, the Company's stock closed at $95.40 per share.

54.   On February 26, 2007, Merrill Lynch was caused by its Board and management to falsely represent to shareholders that the Company's "risk management and control process ensures that [its] risk tolerance is well-defined and understood by [its] businesses as well as by [its] executive management."  Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2006).  On that date, the Company's stock closed at $86.66 per share.

55.   The Board and senior management also understated Merrill Lynch's exposure to subprime mortgages, failing to disclose the actual exposure faced due to CDO and subprime holdings at Merrill Lynch affiliates, which the Company would have to include in its own financials, given the increasingly illiquid market for the securities.   On May 7, 2007, the Company reported that:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions.  The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices.  The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.

Merrill Lynch Quarterly Report (Form 10-Q) (Mar. 30, 2007).

56.   At Defendant O'Neal's direction, in July 2007, Merrill Lynch reported its second-best ever net revenues for its FICC business, but failed to account for the actual valuation of the

Company's warehouse of increasingly illiquid and high-risk CDOs. On the contrary, Merrill Lynch continued to tout its CDO business, citing "continued innovation in the CDO space, including the development of unique new CDO products" among the second quarter highlights for FICC. *Merrill Lynch Second Quarter 2007 Analyst Conference Call,* July 17, 2007, at 5 (*available at* http://files,shareholder.com/downloads/MER/197622170xOx119440/aff5f976-459c-4bf8-8343- 0f18egefaad1/blank.pdf).

57.     Concurrently, the defendants concealed the risks faced by Merrill Lynch by utilizing various off-the-books entities, known as "Variable Interest Entities" (VIEs), which accumulated enormous losses that the Company would later have to absorb and be forced to admit publicly. "VIEs" are special purpose entities that should have been reflected on Merrill Lynch's consolidated balance sheet but were not. The Board and senior management have made only a very limited and inadequate disclosure concerning the nature these of these VIEs and their impact on the Company's consolidated financial condition as reflected in its balance sheet. In its 2007 Annual Report, for example, Merrill Lynch noted as to one type of VIE, the QSPE, simply that "QSPEs are commonly used in mortgage and other securitization transactions. . . . Merrill Lynch typically does not consolidate QSPEs." The Company's Annual Reports purport to provide summary information regarding its VIEs, including total asset size, recourse to Merrill Lynch, and the Company's maximum exposure. However, at the direction of its senior officers, Merrill Lynch essentially used VIEs as Enron had, to mislead and conceal the excessively risky nature of its operations. A February 2008 analysis by the firm CreditSights noted that Merrill Lynch recorded $24.5 billion in subprime write-downs and had $22.6 billion in VIEs. CreditSights' analysis also estimated that securities in firms' (Merrill Lynch's and others') VIEs

might be worth as little as 27 cents on the dollar once they were reflected on the companies' balance sheets.

58. Senior management employed other "hide-the-ball" maneuvers to conceal the Company's subprime exposure. For example, in late 2007, Merrill Lynch furtively asked hedge funds to "park" the Company's subprime assets by one-year off-balance-sheet credit facilities. It asked them to engage in transactions such as nominal sales to them of Merrill Lynch's commercial paper backed by mortgage-related securities, with a buyback guarantee at a minimum price. This ploy with no economic justification other than to conceal Merrill Lynch's exposure to massive losses would temporarily "scrub" the affected assets, which faced loss of value and write-down, if honestly valued on the Company's balance sheet. These Merrill Lynch inquiries to hedge funds, with allegations that some such transactions with hedge funds had in fact been agreed to, received prominent attention in a November 2, 2007 WALL STREET JOURNAL article. The Company issued a misleading denial at the time, which said "We have no reason to believe that any such inappropriate transactions occurred. Such transactions would clearly violate Merrill Lynch policy." That purported denial did not address the heart of the story, namely, whether senior management had, in fact, asked hedge funds to engage in the parking transactions to further conceal and delay public recognition of the materially deteriorated financial condition of the Company's assets.

59. Even as the subprime market deteriorated further in 2007 and further eroded Merrill Lynch's financial condition, its senior management continued to conceal the massive risks and asset deterioration to which the Company was exposed. Senior management continued to re-affirm its risk-management capabilities. Defendant Jeffrey N. Edwards, the Company's Chief Financial Officer, explained deceptively that:

> [w]hile we have seen some positive signals ...the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize.  Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ***ours have proven to be effective in mitigating the impact on our results.*** *Id.* (emphasis added).

Defendant Edwards told investors that the Company's exposure to subprime mortgages was "limited, contained and appropriate."

60.  On the news of Merrill Lynch's purportedly outstanding second quarter performance, its stock closed at $86.20 per share.

61.  Despite their repeated public assurances, the Board and senior management had in fact saddled Merrill Lynch with a massive inventory of highly risky and loss-riddled investments that it could not market while at the same time failing to implement any effective risk-management or risk control strategies to prudently protect the Company.

### D.  THE RECKLESS BUSINESS PRACTICES OF THE BOARD AND SENIOR MANAGEMENT COME TO LIGHT

62.  In 2005 and 2006, the Federal Reserve instituted a series of interest rate increases and the interest rates on variable rate loans, including mortgage loans, began to rise.  Many subprime borrowers, who were able to afford the artificially low "teaser rate" loan payments applicable to their mortgages, no longer could meet their monthly payment obligations.  At the same time, home values began to decline sharply, leading many borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell their properties with any equity remaining.  As a result, many borrowers no longer paid the amounts due on their mortgages, causing defaults to increase significantly.  The widespread defaults on the subprime mortgages that purportedly supported Merrill Lynch's CDOs and other mortgage-backed securities impaired the value of those securities materially.

63.     The imminent collapse of the subprime lending industry was widely-documented. In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modem mortgage market.  Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans,* NEW YORK TIMES (Dec. 20, 2006).   Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.  In this financial environment, the Board and senior management not only exposed the Company to unacceptable risks of loss by continuing to place massive bets on subprime-backed CDOs but exacerbated the risks already taken.

64.     The subsequent collapse of the subprime lending industry -- which was well underway by March of 2007 -- confirmed that securities and derivative instruments backed by subprime and other high-risk asset-backed securities were indeed highly risky and vulnerable to material markdowns in value.   On March 13, 2007, the Mortgage Bankers Association announced that during the fourth quarter of 2006, United States subprime borrowers fell behind in their mortgages at the highest rate in over four years -- up nearly a point from the previous quarter -- and that foreclosures had jumped to an all-time high.  James Tyson, *Senate Weighs Aid to 2.2 Million Subprime Borrowers,* BLOOMBERG NEWS (March 13, 2007).

65.     Reacting to this environment, some analysts questioned the risks posed by Merrill Lynch's exposure to the subprime mortgage market.  Defendant O'Neal unequivocally dismissed those concerns with statements that were both highly misleading and recklessly made.   As MARKETWATCH reported:

> Analysts at Bank of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.  But speaking Thursday in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones

> that reports have "exaggerated and misunderstood the nature of the business
> and how it's managed ... and it's not consistent with what I would assess the
> state of the business to be."

David Weidner, *Merrill Results Could Shed Light On Exposure,* MARKETWATCH (April 12,

2007).

66.    Despite the deteriorating credit and subprime markets, Merrill Lynch continued

underwriting CDOs based on subprime mortgage-backed securities and risky asset-backed

securities.  As late as May 2007, Executive Vice-President Kim vowed that "we are growing our

leading CDO business." *See* Greg Fleming and Dow Kim, *UBS 2007 Financial Services

Conference,* May 14, 2007 (*available at* http://files.shareholdeLcomldownloads

/MERJI97622170xOx97888/03afadb65688- 42f9-a26e-33457bfee007/UBS).

67.    On October 3, 2007, Mr. Semerci, the most recent overseer of Merrill Lynch's

accumulation of CDOs, was terminated.  The next day, BLOOMBERG NEWS reported that Merrill

Lynch had abandoned its plans to do business with the hedge fund managed by its former

executive, Dow Kim.  BLOOMBERG NEWS also reported that: "The company severed ties instead

because Kim had been responsible for the mortgage and fixed-income businesses that are now

causing losses."   Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund,*

BLOOMBERG NEWS (Oct. 4, 2007).

68.    Unfortunately, massive and largely irreparable damage to the Company's business

had already been done.  On October 5, 2007, Merrill Lynch announced that it would take an

estimated $4.5 billion loss on CDOs and related to the Company's subprime exposure.

Defendant O'Neal, who earlier dismissed credit market concerns in a July 2007 memo to

employees, addressed Merrill Lynch employees via video and "took pains to pinpoint the date

that the credit crunch worsened as the day in early August when European central banks first

stepped in to provide liquidity to the banking system, indicating how much conditions had

deteriorated." *Merrill Loss May Be Wider Than Projected, supra.*

      69.   On October 25, 2007, Merrill Lynch shocked the market by taking a massive write-

down of $7.9 billion.   During a conference call announcing the results, Defendant O'Neal

commented:

> Over the past few weeks, our FICC management team, led by David, has
> worked with our Finance staff to undertake a rigorous and comprehensive
> review of our remaining CDO and subprime related exposures.   This
> collective review has resulted in the use of more conservative valuation
> assumptions, and a total net write-down of approximately $7.9 billion for
> this quarter.
>
>         \*\*\*
>
> The bottom line is that we got it wrong by being over-exposed to subprime
> and we suffered as a result of an unprecedented liquidity squeeze and
> deterioration in that market.   No one, no one, is more disappointed than I am
> in the result.
>
>         \*\*\*
>
> Despite the fact that nearly all of our remaining CDO exposure is super
> senior, it turned out that both our assessment of the potential risk and our
> mitigation strategies were inadequate.
>
>         \*\*\*
>
> We're not, I'm not, going to talk around the fact that there were some
> mistakes that were made.   We, I am accountable for these mistakes, just as I
> am accountable for the performance of the firm overall.   And my job, our
> job, the leadership team's job - is to address where we went wrong and what
> changes are necessary, to make sure that we respond to changes in risk
> dynamics early, correctly, and in every asset class at every stage of the
> market's evolution.
>
>         \*\*\*
>
> So, as I have mentioned, we have made a number of important changes....

*Merrill Lynch Third Quarter 2007 Earnings Conference Call,* Oct 24, 2007 (*available at*

http://files.shareholder.com/downloads/MER/197622170x0x139158/ea4f7956-7c53-4e86-86a4-

f8f17f023245/blank.pdf).

70. During the conference call, Defendant O'Neal reiterated the Board's and senior management's failure to manage the Company's risk and warned that additional write-downs were a possibility. *Id.*

71. Despite the magnitude of the announcement, both Defendant O'Neal and Merrill Lynch's Chief Financial Officer, Defendant Edwards, refused to provide complete, straight-forward information regarding the Company's disposition of its inventory of CDOs. Analysts questioned these executives about the $11 billion of CDOs left unaccounted for by the write-down from $32 billion to $15 billion. Defendant O'Neal repeatedly refused to comment. A Lehman Brothers analyst asked whether the existing CDO exposures were held in broker/dealer accounts or on the Company's balance sheet. Defendant Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient." *Id.*

72. During the analyst call, Standard & Poor's announced that it had downgraded Merrill Lynch's debt to A+ from AA-. Merrill Lynch shares fell 5.7%.

73. Neither Defendants O'Neal nor Edwards could explain why the Company's write-down of asset values -- based on a fixed date in time -- had nearly doubled in only three weeks. In fact, Defendant O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time." If that statement is true, it is reasonable to infer that the Company realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

74. The Company's stock continued to drop over the next days, as rumors swirled regarding Defendant O'Neal's future at the Company and analysts downgraded the Company's

stock.  News articles chronicled the FICC business' recent personnel changes and documented the risky practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled the Company before its actual financial condition came to light.

75.    On October 30, 2007, Merrill Lynch announced that Defendant O'Neal had retired, effective immediately.  That day, the Company's stock closed at $65.56 per share, down from a closing price of $76.00 on October 3, 2007, the day before the Company began publicly discussing its subprime losses.

76.    Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure - through hedging or selling CDO inventory - and the financial press reported that the SEC was investigating reports that Merrill Lynch had engaged in transactions with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities.

77.    On November 7, 2007, the Company issued its Form 10-Q report for the third quarter in which it acknowledged that "[o]n October 24, 2007, the SEC staff initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio.  Merrill Lynch is cooperating fully with the SEC in this matter."  Merrill Lynch Quarterly Report (Form 10-Q) (Sept. 30, 2007).

78.    By the end of 2007, the Company had reported losses of $7.78 billion, a decline of $15.28 from the $7.5 billion in profits reported for the previous year.

79.    By the end of 2007, the Company's stock value had decreased by almost half to $50 billion.

80.    By the close of 2007, many analysts suspected that the Company had not yet hit bottom.  Some speculated that the Board and senior executives of Merrill Lynch had not yet disclosed honestly the full extent of the past reckless management of the Company and the true

extent of its exposure to loss from subprime-backed securities and CDOs. Some analysts predicted that the Company faced up to an additional $10 billion in write-downs. Evelyn Rusli, *Morgan Stanley: It Could've Been Worse,* Forbes, Nov. 8, 2007. Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have increasingly lost confidence in the financials of Merrill. It's not enough to say the CEO has gone, problem fixed." *Where Did the Buck Stop at Merrill?, supra.*

81.    Those analysts were correct. On January 17, 2008, Merrill Lynch reported a loss for the fourth quarter of 2007 of $9.8 billion. The reported loss was caused by a total write-down of $16.7 billion that included a $1.6 billion write-down of subprime mortgages. *Merrill Lynch Posts a $9.8 Billion Loss,* NEW YORK TIMES, January 17, 2008. For the first quarter of 2008, the Company reported a further net loss of $1.96 billion, or $2.19 per diluted share, compared to reported net earnings of $2.16 billion, or $2.26 per diluted share, for the first quarter of 2007. *Merrill Lynch Reports First-Quarter 2008 Net Loss From Continuing Operations,* Press Release, April 17, 2008.

82.    Beyond these direct financial consequences of the reckless and improper business practices of senior management, and of the failure of the Board to exercise effective oversight of them, these practices have resulted in Merrill Lynch being subject to a wave of civil lawsuits and regulatory action. Additionally, Merrill Lynch is the subject of SEC investigations of, *inter alia*, improper trades on mortgage securities, excessive valuation of mortgage securities properly and the Company's effort to park subprime securities in hedge funds. MetroPCS sued Merrill Lynch over a $134 million investment made in early 2007 in CDOs that Merrill Lynch underwrote, consisting of highly risky auction-rate securities. In February 2008, Springfield County, Massachusetts, filed an administrative complaint against Merrill Lynch for fraud and

misrepresentation in conjunction with CDOs of auction-market securities it sold.  Merrill Lynch had advertised the CDOs as liquid and high-quality, but they lost 91% of their value. Additionally, investors in Merrill Lynch securities have sued the Company and its senior executives, claiming that they committed securities fraud.    In December 2007, former shareholders of First Republic Bank sued Merrill Lynch for hiding billion of dollars of subprime losses while the companies' merger was pending.

83.    In the wake of the foregoing investigations, civil litigation and administrative proceedings, the Company is subject to claims, penalties and other damages that will cause it to expend billions of dollars to defend against and resolve, all of which has been caused by the conduct of the individual defendants as described above.

**CAUSES OF ACTION**

**COUNT I**

**BREACH OF FIDUCIARY DUTY**

84.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

85.    Each of the individual defendants owed Merrill Lynch and its shareholders the highest fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs.  Each owed Merrill Lynch and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

86.    In taking Merrill Lynch into massive investment and participation in highly risky subprime financing, while failing to implement prudent risk-management processes, defendants disregarded sound business practices and knowingly, intentionally, recklessly, or negligently

breached his or her fiduciary and other duties owed to Merrill Lynch and its shareholders, and, thereby, caused the Company to waste its assets, expend corporate funds improperly, and impair its reputation and credibility for no legitimate business purpose, as a result of which Merrill Lynch has been and continues to be substantially damaged.

87.    In addition, as part of their duty to exercise good faith and diligence in the administration of the affairs of the Company, defendants had and have a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts, as well as other material facts bearing upon its operations and financial condition.  Defendants not only failed to disseminate truthful information concerning the Company's varied and extensive participation in subprime financing, but caused the Company to engage in transactions designed to conceal the Company's true financial and operating condition and artificially inflate the prices of its securities.

88.    Accordingly, plaintiff, on behalf of Merrill Lynch and its shareholders seeks from the individual defendant's monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II

### NEGLIGENCE

89.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

90.    Each individual defendant was negligent in the performance of his or her responsibilities for the management and governance of Merrill Lynch, as a result of which the Company was and will continue to be substantially damaged in an amount presently unknown.

91.     Accordingly, plaintiff, on behalf of Merrill Lynch and its shareholders, seeks from the Company's officers and directors named as defendants herein monetary damages.

## COUNT III

### INDEMNIFICATION

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

93.     Defendants, as fiduciaries and agents of Merrill Lynch, breached their fiduciary and other duties to Merrill Lynch and its shareholders, as set out above.

94.     Merrill Lynch has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it.   Part of that injury suffered by Merrill Lynch as a result of this wrongdoing by the Company's officers and directors may be liability to investors, to government regulators, and others.

95.     Accordingly, plaintiff, on behalf of Merrill Lynch and its shareholders, seeks from the Company's officers and directors named as defendants herein complete and full indemnification to the extent Merrill Lynch is found liable for the wrongdoing of these defendants and those who acted wrongfully together with them.

## COUNT IV

### UNJUST ENRICHMENT

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

97.     Each of the individual defendants was unjustly enriched by the payments made and/or payable to them as compensation and otherwise by the Company.

98.   Throughout the relevant period, each of the directors among the defendants was paid substantial fees for attending meetings and otherwise occupying positions as directors of Merrill Lynch.  Similarly, the senior officers of Merrill Lynch among the defendants were being paid and will be paid substantial salaries and other compensation for their purported services to the Company as well as substantial and undeserved severance and retirement payments.  All of such payments and fees were unearned and unjustified since these officers and directors so utterly failed to fulfill their responsibilities for the management and governance of the Company.

99.   Each of the individual defendants not only received and retained the funds unjustly received but invested such funds, thereby receiving additional unjust enrichment.

100.  As a result of the foregoing unjust enrichment, each of the individual defendants should be required to account to and repay Merrill Lynch the respective amounts unjustly paid plus interest based upon each of these defendants' investment and retention of the proceeds of their unjust enrichment, and to disgorge all other profits, benefits, and compensation obtained by them from their wrongful conduct.

## COUNT V

### WASTE OF CORPORATE ASSESTS

101.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

102.  The wrongful conduct described herein reflected a wanton and reckless waste of Merrill Lynch's corporate assets which has, to date, cost the Company and its shareholders many billions of dollars.

103. Each of the individual defendants, particularly the members of Merrill Lynch's Board, was and is responsible for such waste and should be held accountable to and repay the Company therefore.

## COUNT VI

### VIOLATIONS OF SARBANES-OXLEY

104. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein. Defendants O'Neal and Edwards are the sole defendants to this Count.

105. Defendants O'Neal and Edwards, as Chief Executive Officer and Chief Financial Officer, respectively, signed off on the financial statements of Merrill Lynch and, as such, were personally responsible for the accuracy thereof.

106. Such financial statements materially overstated the assets, earnings, and net worth of Merrill Lynch, and Defendants O'Neal and Edwards engaged in misconduct when they approved them.

107. Pursuant to Section 304 of Sarbanes-Oxley, Defendants O'Neal and Edwards should be required to surrender to the Company all compensation or other benefits paid or arguably payable by Merrill Lynch that were based upon or otherwise tied to its financial statements that were materially false.

### PRAYER FOR RELIEF

Wherefore, plaintiff prays that the Court enter judgment against the defendants:

A.      declaring that each of the individual defendants has breached his or her fiduciary and other duties owed to Merrill Lynch and its shareholders as alleged herein;

B.      directing the individual defendants, jointly and severally, to account for all losses and damages sustained by Merrill Lynch caused by reason of the acts and omissions complained of herein;

C.      awarding Merrill Lynch money damages against all defendants, jointly and severally, for all losses and damages sustained and to be sustained by Merrill Lynch and its shareholders as a result of the acts, omissions and transactions complained of herein;

D.      directing the individual defendants to account for and to remit and disgorge to Merrill Lynch all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation and common stock sales proceeds together with the earnings upon such amounts by which such defendants were unjustly enriched and imposing a constructive trust thereon as well as the earnings such defendants have received thereupon;

E.      ordering that the present members of the Company's Board of Directors and senior management of Merrill Lynch named as defendants herein and those under their supervision and control refrain from further misconduct as alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

F.      ordering the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures including, *inter alia*, establishing and implementing effective underwriting standards and accounting for its operations and financial condition in compliance with GAAP;

G. ordering Defendants O'Neal and Edwards to surrender to the Company all compensation or other benefits paid or arguably payable by Merrill Lynch that were based upon or otherwise tied to its financial statements that were materially false;

H. awarding Merrill Lynch pre-judgment and post-judgment interest as allowed by law;

I. awarding Merrill Lynch punitive damages;

J. awarding plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

K. granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all issues so triable.

July 24, 2008

**GREENFIELD & GOODMAN, LLC**

By: _____
RICHARD D. GREENFIELD (RG 4046)
MARGUERITE R. GOODMAN
780 Third Avenue - 48th Floor
New York, NY 10017
(410)320-5931

**CUNEO, GILBERT & LaDUCA, LLP**

By: _____
JONATHAN W. CUNEO (JC 1112)
ROBERT J. CYNKAR (RC 5305)
DAVID W. STANLEY
507 C Street, N.E.
Washington, DC 20002
202-789-3960

Attorneys for Plaintiff

36

## **VERIFICATION**

I, N.A. Lambrecht, based upon information provided to me by my counsel, do hereby verify that the facts as alleged in the attached Complaint are true and correct to the best of my knowledge, information and belief.

N.A. Lambrecht

**July 24, 2008**

# Exhibit A

**GREENFIELD & GOODMAN LLC**
*ATTORNEYS AT LAW*
**780 Third Avenue**
**48th Floor**
**New York, NY 10017**
**(410) 320-5931**
**(410) 745-4149 (Fax)**
**email: whitehatrdg@earthlink.net**

**Richard D. Greenfield**
*Also admitted to the Maryland*
*and Pennsylvania Bars*

January 22, 2008

Board of Directors
Merrill Lynch & Company, Inc.
World Financial Center
New York, NY 10080

VIA CERTIFIED MAIL #7004 1350 0005 4788 5522

Dear Members of the Board:

I am writing to you on behalf of Jaime and Nancy Lambrecht, the owners of shares of the common stock of Merrill Lynch & Company, Inc.("Merrill" or "the Company") currently and at all relevant times. A copy of the relevant page of their brokerage statement showing such ownership is enclosed with this letter with unrelated information redacted therefrom.

This letter is being sent to you to demand that the Company commence legal proceedings to recover its damages from each of you, from Merrill's present and former senior management (including Stan O'Neal and Ahmass Fakahany) who have also been responsible for the wrongdoing referred to herein, against the accounting firm of Deloitte & Touche, LLP ("DT") and all those other persons or entities who have aided and abetted or otherwise participated in such wrongdoing. This letter is also being sent to you to demand on my clients' behalf that Merrill undertake fundamental corporate governance and policy changes to prevent recurrence of the debacle described below, including failures of the Company's internal and external audits.

This letter is being sent to you in the context of, *inter alia*, the revelations over the past three months of  massive, multi-year mismanagement of the Company, which has led to mark-to-market losses of billions of dollars to date, additional provision for massive losses and the deterioration of Merrill's stockholders' equity of more than $20 billion, primarily due to, according to management, the conduct described herein.

Indeed, there can be no doubt as to responsibility for the Company's near collapse, which was most clearly laid at your doorstep. As Merrill's newly elected Chief Executive Officer, John A. Thain, acknowledged on January 17, 2008: "They shouldn't be taking risks that wipe out the earnings of the entire firm."

1

Although the Company has indicated that it has only $4.8 billion of remaining exposure to sub-prime related write-downs of assets, according to Merrill's Senior Economist, Kathy Bostiancic: "We've only seen maybe the first wave or two impact, and there's more to come." Indeed, the Company has additional undisclosed exposure not merely to sub-prime related "assets" but additional exposure both on and off Merrill's balance sheet, as well as substantial contingent exposure. Such exposure is a consequence of, among other reasons, Merrill's exposure to investigations and on-going litigation as well as management's violation of its oft-proclaimed promise: "The interests of our clients always come first."

By way of one example, Merrill sold to the City of Springfield, Mass. collateralized debt obligations ("CDOs"), highly inappropriate, illiquid and unsuitable investment vehicles for most state and local governments. Merrill management also widely sold to customers structured investment vehicles ("SIVs"), another type of financial derivative "product", that has subjected the Company to various investigations by state and other regulators. Merrill's packaging and sale of CDOs and SIVs have subjected the Company to massive liabilities to purchasers of such "products," none of which is reflected in Merrill's financial statements.

Based upon an analysis of the Company's financial statements as of September 30, 2007, it is believed that, even with the reduction of shareholders' equity of $8.4 billion as of such date, management intentionally understated such reduction. Such understatement and deception continued as revealed, in part, by the Company's disclosures of January 17, 2008, when it reported a further $9.8 billion loss for the quarter ended December 31, 2007 and $16.7 billion in write-downs on, *inter alia*, mortgage-related investments and leveraged loans. This financial debacle was caused by a systemic failure of risk management and lax credit standards during the last several years at the Board level and within senior management, all of which has caused the Company to suffer billions of dollars in damages as described herein and untold billions going forward, leaving it perilously short of capital and causing it to go hat-in-hand to foreign investors.

In fact, each of you and former Chairman and CEO Stan O'Neal knew or should have known that, as presently structured, the Board was unable to properly supervise the Company's operations and management (which had grown to the point of being uncontrollable), reduce its financial exposure to risk and make sure that its publicly disseminated financial statements were prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), which they were not. Indeed, the Company has yet to fully recognize the financial impact of the high-risk strategies pushed by Mr. O'Neal and readily acquiesced in by each of you.

All of this is in stark contrast to the statement made publicly by former CEO O'Neal on February 22, 2007, only months before the revelations disclosed above and his "retirement":

> "I am pleased to report that, by virtually any measure, Merrill Lynch completed the most successful year in its history---financially, operationally, and strategically."

This bold statement, while true in certain respects, was false and misleading inasmuch as former CEO O'Neal and his colleagues in Merrill's senior management had built a "house of cards" built in part on the construction and sale of esoteric financial instruments that were based upon, *inter alia,* sub-standard and highly risky mortgage loans and their securitized brethren, CDOs

2

and SIVs, some of which the Company retained for its own portfolio. Notwithstanding this fact known or which should have been known to each of you, in November 2007, Merrill's management issued a news release announcing: "Why Merrill Lynch is Still Bullish on Merrill Lynch" which proclaimed falsely that the Company's "financial position and liquidity remain strong." By such statements, in which you undoubtedly acquiesced, the Company was caused to continue to misrepresent its actual financial condition, which was deteriorating at an alarming rate, and to conceal the fact that its assets, earnings and shareholders' equity were materially overstated.

By acting as such and permitting such manipulations and concealment to take place, you, senior management and the Company's auditor, DT, have caused Merrill to violate federal disclosure laws and subjected it to litigation by those who purchased its securities and various proprietary derivative "products" during the period of such wrongdoing. In turn, this has subjected and will subject the Company to expenses of more billions of dollars to resolve the claims of such purchasers.

Notwithstanding the fact that the Company's shareholders have been "Merrill Lynched" by the conduct described herein, you wasted corporate assets by awarding Mr. O'Neal with a compensation package at the time of his appointment as CEO and thereafter which failed to align his interests with those of Merrill and its shareholders. Despite leaving the Company as a financial "basket case," Mr. O'Neal will receive approximately $161.5 million as a "going away" present.

Each of you and senior management was aware of or should have been aware of the consequences to the Company of following Mr. O'Neal's "risk-be-damned" strategies and the damages they were likely to cause Merrill, its shareholders and its customers eventually. These massive damages, which are first beginning to surface, are likely to increase substantially as the Company is forced to acknowledge further the reality of its contingent liabilities referred to above, the remainder of its highly questionable loan/derivatives portfolio burdened with excessive credit risks and its off-balance sheet transactions. Also, due to the lowering of Merrill's own credit ratings in the wake of the foregoing debacle, it will suffer additional damages as its cost of capital has risen and will rise further. Indeed, in obtaining $6.2 billion in new capital in December from, *inter alia*, Temasek Holdings Pte. Ltd. and the mutual funds advised by Davis Selected Advisers LP, Merrill shareholders' equity has been greatly diluted as a result of the terms the Company has been forced to yield to these most recent "bail-out" investors. Press reports indicate that Merrill is seeking at least another $4 billion in new capital from a Middle Eastern sovereign investment fund. In describing such "hat-in-hand" searches for new capital, a respected analyst at Sanford C. Bernstein said that shareholders "view this as the kind of capital you raise *in extremis*."

Your errors and omissions, as well as those of senior management of the Company and DT, have caused massive damages to Merrill and its shareholders.

On behalf of my clients, I hereby demand that Merrill commence legal proceedings to recover its damages from each present and former member of its Board of Directors who held such position during the period which the conduct described above took place; those senior officers of the Company who carried out and/or participated in the mismanagement referred to above and thereafter covered up such mismanagement and its consequences; and all those who aided or abetted the Company's officers and directors in carrying out the wrongdoing referred to above.

These include, but are not limited to, various originators of high risk loans and/or packagers thereof, Merrill's purportedly independent auditor, DT, and those firms which directly or indirectly provided so called "appraisals" and/or credit ratings upon which the Company and/or the originators of the loans referred to above relied, directly or indirectly, to the Company's detriment. As you know, as a result of the misconduct of its officers and directors and other culpable persons, Merrill has already sustained substantial damages and continues to be subject to further damages in the billions of dollars as well as the massive legal and other expenses of defending against and resolving claims made against the Company by purchasers of its securities.

Similarly, to the extent that any of the foregoing persons has been unjustly enriched at the expense of the Company, including those entities and persons who have received fees and/or other compensation that was excessive under the circumstances referred to above, I demand that the Merrill commence litigation against them seeking injunctive relief which, *inter alia*, requires them to account to it and repay any such unjust enrichment together with the earnings thereon. Included within such unjust enrichment are the proceeds of the exercise of any stock options by senior officers during the relevant period while in possession of material inside information, as well as any salaries and bonuses received by such senior officers (including the compensation paid and to be paid to Mr. O'Neal) and, in the case of DT, fees paid to it during the relevant period for its purported audits of the Company's financial statements.

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your failure to date to cause Merrill to appropriately pursue all of its claims arising from the matters referred to herein. Should you not act to protect Merrill's valuable claims as set forth herein, you will be engaging in further waste of its assets. The demands have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced.

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,

/s/

Richard D. Greenfield

RDG:gw
Enclosure

4

# Exhibit B

**Judith A. Witterschein**
Managing Director & Corporate Secretary

Merrill Lynch & Co., Inc.

Office of General Counsel
222 Broadway
17th Floor
New York, New York 10038
212 670 0420
FAX 212 670 4703
judy_witterschein@ml.com


**Merrill Lynch**

May 1, 2008

**VIA OVERNIGHT MAIL**

Richard D. Greenfield
Greenfield & Goodman LLC
780 Third Avenue, 48th Floor
New York, NY 10017

**Re:** **January 22, 2008 Letter**

Dear Mr. Greenfield:

I write with respect to your letter dated January 22, 2008 to the Board of Directors of Merrill Lynch & Co., Inc. ("Merrill Lynch"). Please be advised that after careful consideration, the Board of Directors has determined that it is not in the best interests of Merrill Lynch to commence legal proceedings as demanded in your letter.

In reaching this determination, the Board of Directors considered a significant amount of information, including, among other things, information presented at January 28 and April 24, 2008 Board of Directors meetings. In assessing this information, the Board of Directors took into account, among other things, the amount of damages claimed in the pending federal securities and ERISA lawsuits and regulatory investigations involving Merrill Lynch's investment in and underwriting of collateralized debt obligations, as well as the likelihood of recovering such amounts from the individuals who would be named as defendants in the lawsuits proposed in the demand letters; the potential adverse effect of pursuing the claims asserted in your January 22 letter on Merrill Lynch's defenses in the pending federal securities and ERISA lawsuits and regulatory investigations; and the significant risk that a lawsuit against directors and officers could require Merrill Lynch, under applicable Delaware law and its Certificate of Incorporation, to indemnify these individuals for the substantial costs and expenses they would incur in defending the action. The Board also considered the significant remedial actions already undertaken to address the issues raised in your January 22 letter, as well as the exacting standard that must be met in order to prove that directors or officers breached fiduciary duties by failing to adequately exercise oversight over employees of Merrill Lynch.

After considering and extensively discussing the foregoing and other information, including during two Board of Directors meetings, the Board has determined that pursuing the claims raised in your January 22 letter is not in the best interests of Merrill Lynch at this time.

Very truly yours,